COURT OF APPEALS
DECISION
DATED AND FILED

January 21, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing.  If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.  *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2023AP991-CR**

Cir. Ct. No.  2019CF299

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

COLTON GREGORY KEHOE,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Brown County: MARC A. HAMMER, Judge.  *Affirmed.*

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.   Colton Kehoe appeals a judgment of conviction for first-degree reckless homicide as a party to the crime and an order denying his

postconviction motion seeking to withdraw his no-contest plea to that charge.[1] Kehoe argues that he is entitled to withdraw his plea because: (1) his trial counsel was constitutionally ineffective; (2) his plea was not made knowingly, intelligently and voluntarily; and (3) the DNA analysis report of the knife used by the victim during the crime constitutes newly discovered evidence. We reject Kehoe's arguments and affirm.

## BACKGROUND

¶2      In March 2019, the State charged Kehoe with conspiracy to commit armed robbery, first-degree reckless homicide as a party to the crime, and conspiracy to commit obstructing an officer. According to the criminal complaint, Kehoe, Gavin Rock, Jarid Stevens, and Jared Williquette planned to rob Felix[2] under the guise of buying drugs from him. Stevens drove the group to the parking lot of Felix's residence, and Felix then entered the vehicle. Williquette was in the front passenger seat, Rock was in the driver's side backseat, and Kehoe was in the passenger's side backseat. When Felix entered the vehicle, Kehoe moved to the middle seat to allow Felix to sit in the passenger's side backseat.

¶3      According to Williquette and Kehoe, Kehoe was tasked with scaring Felix by pulling out a knife, but Kehoe did not pull out the knife because, according to Kehoe, he "froze." Instead, after Felix provided the drugs, Williquette told Felix that he had a gun, but Felix did not believe him. Williquette

---

[1] Kehoe also pled no contest to, and was convicted of, conspiracy to commit obstructing an officer, but that conviction is not at issue in this appeal.

[2] Although not required by WIS. STAT. RULE 809.86 (2023-24), we refer to the homicide victim using a pseudonym in this opinion to protect his family's privacy. All references to the Wisconsin Statutes are to the 2023-24 version.

then pulled out the gun's clip, showed it to Felix, put the clip back in the gun, racked the gun's slide back and forth, and asked Felix if he had any money. Felix then reached into his pocket, pulled out a knife, and tried to stab Williquette. According to Williquette and Rock, Kehoe attempted to stop Felix by grabbing him as he reached for Williquette.

¶4    Williquette then shot Felix once, and Felix died as a result of that gunshot wound. After Williquette shot Felix, Kehoe pushed Felix out of the vehicle, and the remaining occupants drove away. After they left, the four men discussed what they would tell law enforcement if they were questioned about the shooting. They agreed to tell law enforcement that Felix had tried to rob them and that Williquette had shot Felix in self-defense.

¶5    All four men were eventually charged in relation to Felix's death.[3] In July 2020, pursuant to a plea agreement, Kehoe agreed to plead no contest to first-degree reckless homicide as a party to the crime and to conspiracy to commit obstructing an officer. In exchange, the State agreed to dismiss and read in the conspiracy to commit armed robbery charge, and it agreed to recommend a 30-year prison sentence, consisting of 20 years of initial confinement followed by 10 years of extended supervision.

¶6    Following a thorough plea colloquy, during which the circuit court reviewed Kehoe's signed plea questionnaire and waiver of rights form, the court accepted Kehoe's no-contest pleas. The court found that Kehoe entered his pleas knowingly, intelligently and voluntarily, and that the record provided a sufficient

---

[3] The cases against the other three individuals are not relevant to this appeal, and they will not be discussed further.

3

factual basis to support his pleas. On the count of first-degree reckless homicide as a party to the crime, the court subsequently imposed a 26-year prison sentence, consisting of 18 years of initial confinement followed by 8 years of extended supervision.

¶7 After his sentencing, Kehoe moved for postconviction relief, seeking to withdraw his plea based upon an alleged manifest injustice. Kehoe argued that he received ineffective assistance of counsel and that his plea was not entered knowingly, intelligently and voluntarily. Both claims were based on Kehoe's assertions that his trial counsel failed to investigate Kehoe's self-defense claim and that counsel misadvised Kehoe as to the viability of that defense. Kehoe also argued that DNA evidence on the blade of Felix's knife constituted newly discovered evidence.

¶8 Following a *Machner*[4] hearing, at which both Kehoe and his trial counsel testified, the parties stipulated to several facts regarding a report of a DNA analysis performed on Felix's knife. Among other things, the parties stipulated that Kehoe's counsel received that report in October 2019, which was over nine months before Kehoe pled no contest. Kehoe also supplemented his postconviction motion with a claim that his plea was not knowing, intelligent or voluntary because of his attention deficit hyperactivity disorder ("ADHD").

¶9 The circuit court issued a written decision denying Kehoe's postconviction motion. The court concluded that Kehoe failed to show that his trial counsel was ineffective; that the plea colloquy transcript and Kehoe's

---

[4] *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

counsel's testimony did not support the assertion that Kehoe's plea was not knowing, intelligent and voluntary; and that even if the DNA analysis report were newly discovered evidence, it did not create a reasonable probability of a different result—i.e., that Kehoe would not have entered a plea and would have instead gone to trial. Kehoe appeals. Additional facts will be provided below as necessary.

## DISCUSSION

¶10     On appeal, Kehoe argues that he is entitled to withdraw his no-contest plea on the grounds that: (1) his trial counsel failed to investigate Kehoe's self-defense claim and failed to properly advise Kehoe regarding the viability of a self-defense claim; (2) his trial counsel's misrepresentation about the availability of a self-defense claim and his ADHD diagnosis made Kehoe's plea not knowing, intelligent and voluntary; and (3) the DNA analysis report constituted newly discovered evidence.

¶11     A defendant is entitled to withdraw his or her plea after sentencing when he or she establishes, by clear and convincing evidence, that plea withdrawal is necessary to correct a manifest injustice. *State v. Cain*, 2012 WI 68, ¶25, 342 Wis. 2d 1, 816 N.W.2d 177. A defendant may make this showing in two ways. *State v. Villegas*, 2018 WI App 9, ¶18, 380 Wis. 2d 246, 908 N.W.2d 198. First, the defendant may establish a manifest injustice by showing that "some factor extrinsic to the plea colloquy" rendered the plea unknowing, unintelligent or involuntary pursuant to *State v. Bentley*, 201 Wis. 2d 303, 548 N.W.2d 50 (1996), and *Nelson v. State*, 54 Wis. 2d 489, 195 N.W.2d 629 (1972). *See Villegas*, 380 Wis. 2d 246, ¶19 (citation omitted). Factors extrinsic to the plea colloquy that establish a manifest injustice include ineffective assistance of counsel and newly

discovered evidence. *See id.*; *State v. McCallum*, 208 Wis. 2d 463, 473, 561 N.W.2d 707 (1997).

¶12    Second, the defendant may establish a manifest injustice by showing that his or her plea was not entered knowingly, intelligently or voluntarily due to a defect in the plea colloquy. *Villegas*, 380 Wis. 2d 246, ¶20. This approach requires the defendant to show that the plea colloquy failed to comply with Wis. Stat. § 971.08 or other mandatory procedures set forth in *State v. Bangert*, 131 Wis. 2d 246, 261-62, 389 N.W.2d 12 (1986). *Villegas*, 380 Wis. 2d 246, ¶20. If the defendant makes a prima facie case that the plea colloquy was inadequate, "the burden shifts to the State to prove by clear and convincing evidence that the plea was nonetheless knowing, intelligent, and voluntary." *Id.*

## I.  Ineffective Assistance of Counsel

¶13    Kehoe alleges that he informed his trial counsel that his actions were in self-defense, pointing specifically to his act of grabbing Felix to prevent him from stabbing Williquette with the knife and to Kehoe's belief that the knife had cut Williquette. Without citation to the record, Kehoe argues that his counsel's notes "never documented a discussion about the possibility of a self-defense theory" and did not "outline any efforts to investigate Mr. Kehoe's claims."[5] Kehoe contends that if counsel had investigated his self-defense claim, counsel would have found that the DNA analysis report finding Williquette's DNA on the knife's blade corroborated that claim.

---

[5] During the *Machner* hearing, Kehoe's counsel testified about his notes, but the notes were offered only to refresh counsel's recollection and were not offered as evidence. Counsel testified that he took notes of some, but not all, of his discussions with Kehoe.

¶14 Kehoe also claims that he was not made aware of the DNA analysis report prior to entering his plea and that his trial counsel's notes are not clear as to when he received the report and whether he reviewed it. Because Kehoe was not made aware of the report and his counsel did not "explore[] [the report] in support of [a] self-defense theory," Kehoe argues that his trial counsel performed deficiently. Kehoe further contends that counsel inadequately advised him by stating that "there was no self-defense because there is no physical evidence supporting self-defense." Had counsel informed Kehoe about the DNA analysis report and had counsel correctly advised Kehoe regarding the availability of self-defense, Kehoe asserts that he would not have entered his plea and would have instead gone to trial.

¶15 An ineffective assistance of counsel claim requires a defendant to show both that his or her counsel's performance was deficient and that the deficient performance prejudiced the defense. *Id.*, ¶23. This claim presents a mixed question of law and fact. *State v. Savage*, 2020 WI 93, ¶25, 395 Wis. 2d 1, 951 N.W.2d 838. We uphold the circuit court's findings of fact—including those regarding trial counsel's conduct and strategy—unless they are clearly erroneous. *Id.* Whether trial counsel's assistance was ineffective is a question of law that we review de novo. *Id.*

¶16 Counsel's performance is deficient when his or her representation falls below an objective standard of reasonableness, considering all the circumstances. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). We strongly presume that counsel's conduct "falls within the wide range of reasonable professional assistance." *Id.* at 689. Counsel's deficient performance is prejudicial if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

at 694. Generally speaking, a reasonable probability means "a probability sufficient to undermine confidence in the outcome." ***Id.***

¶17 In the plea withdrawal context, however, a defendant establishes prejudice by showing that "there is a reasonable probability that, but for counsel's errors, he [or she] would not have pleaded guilty and would have insisted on going to trial." *Savage*, 395 Wis. 2d 1, ¶33 (citation omitted). A defendant can establish prejudice in this manner by: (1) showing, based on contemporaneous evidence, "that counsel's deficient performance so offended 'expressed preferences' such that the defendant would have not pleaded guilty"; or (2) showing "that the defense would have likely succeeded at trial." *Id.*, ¶35 (citation omitted).

¶18 Here, Kehoe ignores his trial counsel's *Machner* hearing testimony showing that counsel *did* investigate Kehoe's self-defense claim and explaining why that defense would have been difficult to present at a trial, due to the circumstances that led to the shooting and the fact that Kehoe was charged with both the party to the crime and conspiracy modifiers. In particular, Kehoe's counsel testified that he discussed self-defense with Kehoe "on day one" because it "was one of the things that popped up in [counsel's] mind," based on how Kehoe presented the facts of the case to counsel. Specifically, counsel testified that "in a vacuum, if they were in a vehicle and someone lunged at one of the people with a knife and the person ended up shooting that person, on its face, self-defense would be something we would consider at that point."

¶19 Regarding the availability of self-defense as a potential defense, Kehoe's counsel testified that the State informed him that it would amend the first-degree reckless homicide charge to a felony murder charge if Kehoe chose to go to trial. Counsel explained that the possibility of an amended charge changed

his perspective on the viability of a self-defense claim. He explained that he "did the research on the case law" based on the possibility of the State amending the charge and that

> the availability of a self-defense [claim] in that particular matter would have to go to the court as far as determining whether or not we would be able to use the facts and such. From my perspective, that at least l[ed] me to believe that self-defense wouldn't be a viable defense to Felony Murder. If we were to go to trial on the original count which was the Reckless Homicide, I think it is probably more available there but I don't think it's a slam dunk. At that point, we're talking about reckless conduct and self-defense is a negation of mens rea as well which is intent. So, yes, we discussed self-defense. The summary is, based upon what we were told by the State about how they would amend the Criminal Complaint or the Information, if we went to trial, self-defense was not going to be a viable option for us. Even if the court granted it, it was bad facts to present to the jury. We had that discussion at least one or two times.

Counsel added that he did not recall telling Kehoe that "there was no physical evidence in his case that would support a claim of self-defense."

¶20 Kehoe's counsel also testified that both the conspiracy and party to the crime modifiers affected his analysis of the viability of a self-defense claim. Counsel explained that the self-defense claim required "a jury to believe that one of the codefendants was acting in self-defense." However, because the alleged conspiracy was that all four men planned to commit the robbery, that fact was not a "good fact" to present to the jury when claiming self-defense. Counsel had the same concerns regarding the party to the crime modifier and its likely impact on a jury's consideration of a self-defense claim.

¶21 Kehoe's counsel further testified about his receipt of discovery. Counsel stated that he had not yet received any discovery at the time of his first

9

meeting with Kehoe in March 2019, but by the time of Kehoe's plea in July 2020, he had received all of the discovery to date and had reviewed it with Kehoe. Finally, counsel testified that a report confirming that Felix's DNA was on the knife handle and that Williquette's DNA was on the knife blade did not change counsel's understanding of the facts, and, instead, confirmed what counsel understood the facts to be.

¶22     The circuit court found that Kehoe's trial counsel considered and discussed self-defense with Kehoe and that counsel "understood the basis for the defense, and how the defense would play at trial." It further recognized counsel's belief that self-defense would have been difficult to assert for either the first-degree reckless homicide charge or the felony murder charge because "its use in this fact pattern (the knife being presented after the victim was confronted with the gun), and Kehoe's participation in the underlying crime (as a co-defendant), would have been of limited effect." Because counsel "reviewed discovery, considered the application of self[-]defense in the matter charged and the matter that could [have] been amended, and advised his client[] as to his legal rights and options," the court concluded that it was "not reasonable to suggest that [Kehoe's counsel's] investigation was limited and/or inadequate."

¶23     We agree with the circuit court, and we independently conclude that Kehoe's counsel did not perform deficiently as to his investigation and advice regarding the viability of a self-defense claim. Counsel considered, investigated and discussed self-defense and its availability as a potential defense with Kehoe. Counsel's review would have included the DNA analysis report, of which Kehoe claims he was unaware, because the parties stipulated that counsel received the report in October 2019, and Kehoe's counsel testified that he had received all the discovery by the time of Kehoe's plea in July 2020. Noting the difficulties with

10

asserting self-defense due to the facts of the case—namely, that Kehoe was part of a plan to rob Felix by using a weapon, the charged modifiers, and the possibility of an amended charge—counsel reasonably advised Kehoe as to the relative efficacy of pursuing a self-defense claim.

¶24 In his reply brief, Kehoe takes issue with his trial counsel's testimony that self-defense would have been difficult to assert at trial. In particular, he notes that our state supreme court reversed a circuit court decision refusing "to instruct on self-defense in a burglary and first-degree intentional homicide case in" *State v. Johnson*, 2021 WI 61, 397 Wis. 2d 633, 961 N.W.2d 18. Kehoe does not develop this argument further, and we reject it on that basis. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (stating that the court of appeals need not address undeveloped arguments). Kehoe also argues that there is no case law supporting his trial counsel's "assertion that self-defense may not be instructed where the charge is felony murder." As noted above, however, counsel did not make that assertion. Rather, he believed that the instruction would have been more difficult to obtain regardless of whether the charge was amended, given the facts of the case.

¶25 Because Kehoe has not shown that his counsel performed deficiently, we need not address the prejudice element of the ineffective assistance analysis. *See State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93 (stating that we need not address both elements of an ineffective assistance of counsel claim if the defendant fails to make a sufficient showing on one).

## II. Knowing, Intelligent and Voluntary Plea

¶26    Kehoe next argues that he did not enter his plea knowingly, intelligently and voluntarily because he relied on his trial counsel's "material misrepresentation about the availability of self-defense," and, specifically, on counsel's "statements about not being able to pursue self-defense because there is no evidence."  Kehoe also argues that his ADHD diagnosis and his age rendered his plea unknowing, unintelligent and involuntary.  Kehoe contends that he has taken medication for his condition since 2010 and that it is "well-documented that those with ADHD, as well as those of a younger age, may struggle to understand legal hearings."  Kehoe then makes several assertions related to his trial counsel's failure to consider Kehoe's ADHD or age when discussing the entry of his plea.

¶27    Whether a defendant entered his or her plea knowingly, intelligently and voluntarily is a question of constitutional fact.  *State v. Dillard*, 2014 WI 123, ¶38, 358 Wis. 2d 543, 859 N.W.2d 44.  We uphold "the circuit court's findings of historical facts unless they are clearly erroneous," but we independently determine whether those facts show that the defendant entered his or her plea knowingly, intelligently and voluntarily.  *Id.*

¶28    While misinformation about the law may support a conclusion that a plea was unknowing, unintelligent and involuntary, *see id*, ¶39, Kehoe simply contends that if he had "been properly informed about his ability to establish self-defense," then he would not have entered his plea.  As discussed above, however, Kehoe's trial counsel did not misinform Kehoe about either the availability of a self-defense claim or its likelihood of success.  Rather, counsel provided reasonable advice regarding the difficulty of raising self-defense based on the charges, the possibility of an amended charge, and the facts of the case.

¶29    In addition, Kehoe fails to explain how the availability of self-defense as a trial defense led him to misunderstand any aspect or consequence of his plea.  The cases that he cites in support of his argument are therefore inapt. In those cases, the defendant's plea was rendered unknowing, unintelligent and involuntary because the defendant misunderstood the effect of entering a plea based on misinformation about the law provided by the State, the defendant's trial counsel, and the court.  *See* ***State v. Riekkoff***, 112 Wis. 2d 119, 128, 332 N.W.2d 744 (1983) (misinforming the defendant that he had preserved his right of appellate review of an issue waived by the guilty-plea waiver rule); ***State v. Charles Brown***, 2004 WI App 179, ¶13, 276 Wis. 2d 559, 687 N.W.2d 543 (misinforming the defendant that he would not be required to register as a sex offender and that he would not be subject to post-incarceration commitment); ***State v. Dawson***, 2004 WI App 173, ¶¶13-14, 276 Wis. 2d 418, 688 N.W.2d 12 (misinforming the defendant that he could reopen his case upon completing probation to amend the charge to a lesser one); ***State v. Woods***, 173 Wis. 2d 129, 138-40, 496 N.W.2d 144 (Ct. App. 1992) (misinforming the defendant about his potential sentence based on the "legal impossibility" that an adult sentence could run consecutive to a juvenile disposition).

¶30    Regarding his ADHD diagnosis, Kehoe claims that he had not taken his ADHD medication at the time he entered his plea; that his counsel "had demonstrable evidence that there was a decent chance that Mr. Kehoe, at a minimum, was in mental distress at the time he entered his plea"; and that it was unreasonable for his counsel not to at least question Kehoe's ability to enter a knowing, intelligent and voluntary plea.  Kehoe adds that this situation was "compounded" with his counsel's failure to explain the State's plea agreement. Specifically, Kehoe asserts that counsel "did not explain that a felony murder

conviction would have significantly less exposure than that of a first[-]degree reckless homicide conviction."

¶31    Kehoe's argument based upon his ADHD diagnosis fails. Instead of explaining how his ADHD and age affected his ability to enter a knowing, intelligent and voluntary plea, or how they affected the circuit court's duties at the plea colloquy, Kehoe takes issue with his counsel's alleged failures to consider those factors when advising him on entering a plea and explaining the plea agreement. Kehoe's claims sound as an extrinsic factor to the plea colloquy under *Nelson*/*Bentley* rather than a defect with the plea colloquy under *Bangert*. As such, we conclude that merely alleging that his ADHD and age rendered his plea infirm is insufficient to show, by clear and convincing evidence, that Kehoe's plea was unknowing, unintelligent and involuntary.

¶32    The circuit court's duties at a plea hearing include determining "the extent of the defendant's education and general comprehension so as to assess the defendant's capacity to understand the issues at the hearing." *State v. James Brown*, 2006 WI 100, ¶35, 293 Wis. 2d 594, 716 N.W.2d 906. The court here did so. It found in its ruling on the postconviction motion that during Kehoe's plea colloquy, it confirmed Kehoe "understood every word in the plea questionnaire, and discussed every word of the plea questionnaire, including the words, concepts, and meanings with his lawyer prior to taking the plea." It also found that "[t]here was no influence or suggestion that Kehoe lacked any degree of mental capacity to understand what he was doing and the impact of his plea." Kehoe fails to point to any deficit in the court's plea colloquy.

¶33    Likewise, Kehoe provides no evidence that his trial counsel somehow knew that Kehoe was in mental distress at the time of his plea. Indeed,

14

the circuit court found that Kehoe's counsel's testimony did not support Kehoe's claim regarding his plea and that "[e]ach matter Kehoe had ple[d] to was carefully reviewed with him," including the nature of the crime and the elements of the crime. At the ***Machner*** hearing, Kehoe's counsel recalled that when Kehoe decided to enter his plea, the State gave him "a choice to enter a plea between Homicide and Felony Murder. The State was giving him the choice and he wanted to plead to the Homicide, he didn't want the word 'murder' associated with his record." Counsel explained that Kehoe faced less exposure with felony murder than with reckless homicide. His concern with the State's possible amendment to felony murder, however, went to the presentation of the case and trial strategy and not to exposure because felony murder was more difficult to defend. Counsel added that he explained to Kehoe the difference between the elements of felony murder and reckless homicide.

¶34 Kehoe does not argue that the circuit court's findings are clearly erroneous, and we see no reason to conclude that they are. As noted above, Kehoe fails to explain how the ADHD diagnosis and his age affected his ability to enter a plea, how those factors affected his understanding of his counsel's explanation of the plea, and how those factors made his plea not knowing, intelligent and voluntary. Accordingly, we conclude that Kehoe has not shown that his plea was not entered knowingly, intelligently and voluntarily.

## III. Newly Discovered Evidence

¶35 Kehoe's final argument is that the DNA analysis report authored on August 28, 2019—which stated that Williquette's DNA was found on Felix's knife blade—was newly discovered evidence. Kehoe contends that the evidence is newly discovered because he did not learn about the evidence until after he was

15

convicted, it corroborates his self-defense theory, and it is not cumulative, given that there was no similar evidence that would be probative of self-defense other than his own testimony.

¶36    In order for newly discovered evidence to constitute a manifest injustice, the defendant must show, by clear and convincing evidence, that: "(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative." *McCallum*, 208 Wis. 2d at 473.  If the defendant makes this showing, the circuit court must determine whether there is a reasonable probability that a different outcome would be reached in a trial.  *Id.*  We review a circuit court's decision regarding newly discovered evidence for an erroneous exercise of discretion.  *See State v. Plude*, 2008 WI 58, ¶31, 310 Wis. 2d 28, 750 N.W.2d 42.  However, whether there is a reasonable probability that a different outcome would be reached in a trial is a question of law that we review independently.  *See id.*, ¶33.

¶37    We conclude that the DNA analysis report does not constitute newly discovered evidence because Kehoe cannot show that he did not discover the evidence until after he was convicted.  Evidence that is available and known to the defendant, his or her trial counsel, or both at the time of entering a plea is not newly discovered evidence.  *See State v. Fosnow*, 2001 WI App 2, ¶16, 240 Wis. 2d 699, 624 N.W.2d 883 (2000).  Instead, it is "simply 'the newly discovered importance of existing evidence.'"  *Id.* (citation omitted).

¶38    Here, Kehoe and his trial counsel had the DNA analysis report available to them prior to Kehoe's July 2020 plea.  Following the *Machner* hearing, Kehoe and the State stipulated that the DNA analysis report was authored

on August 28, 2019, and that the report was sent to Kehoe's trial counsel on October 9, 2019. In addition, counsel testified that he had received all of the discovery to date and had reviewed it with Kehoe by the time of his plea. Moreover, the undisputed facts of this case establish that Kehoe knew what happened in the vehicle when Felix wielded the knife and lunged at Williquette, knew that DNA samples had been collected, and knew that the State had filed a notice to introduce DNA evidence at his trial. In other words, Kehoe should have known about this potential evidence. In all, because the DNA analysis report existed and was made available to Kehoe and his counsel well before Kehoe's plea in July 2020, it is not newly discovered evidence. *See id.*

¶39 In his reply brief, Kehoe acknowledges the stipulation filed by the parties, but he argues, for the first time, that his trial counsel could not have been aware of "the latest DNA report" at the time of Kehoe's plea because a subsequent report was issued on April 28, 2021, which, according to Kehoe, showed that Williquette's DNA may have been present under Felix's left hand fingernails. Following Kehoe's plea, additional testing was done on fingernail samples from Felix's hands, and the results of that testing were presented at Williquette's trial. The subsequent report showed the presence of DNA on Felix's left hand fingernails from at least two males, but it made no conclusion regarding the presence of Williquette's DNA. Kehoe asserts that this evidence makes his version of events more likely.

¶40 Because Kehoe did not make this assertion regarding the DNA under Felix's fingernails in his opening appellate brief and raises it for the first time in his reply brief, we decline to consider it on that basis. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998) (stating

that the court of appeals generally does not consider arguments raised for the first time in a reply brief).[6]

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[6] Kehoe additionally argues that his trial counsel's cumulative deficiencies "greatly impacted Mr. Kehoe's ability to make an intelligent, knowing and voluntary decision regarding case disposition" and that those deficiencies "undermine confidence in the resolution of this case." Because Kehoe has failed to show his trial counsel performed deficiently on any of the grounds he alleges, we reject his aggregate prejudice claim. *See State v. Thiel*, 2003 WI 111, ¶¶60-61, 264 Wis. 2d 571, 665 N.W.2d 305 (explaining that while a court "may aggregate the effects of multiple incidents of deficient performance" when determining prejudice, a defendant "may not simply present a laundry list of mistakes by counsel and expect to be awarded a new trial").